Good morning, Your Honors. Stuart Seaborn of Disability Rights Advocates for the American Diabetes Association. May it please the Court, Your Honors, I'd like to reserve three minutes for rebuttal. Certainly. Your Honors, the District Court erred in several ways in finding that the American Diabetes Association did not have standing to pursue the Army's ongoing failure to accommodate children with diabetes in its child care programs. Most notably, the District Court erred in requiring a quantifiable minimum threshold for direct organizational standing proportionally tied to the size of the organization. Now, this error not only has the potential to affect organizations like the American Diabetes Association, but also any large civil rights organization that represents individual constituents, whether it be the Sierra Club, the NAACP, etc. The District Court also made an erroneous mootness finding which confused the Court's inquiry on the merits, in other words, whether the policies and practices that existed at the time of the operative complaint discriminated on the basis of disability, with the jurisdictional inquiry, in other words, whether or not the association, the American Diabetes Association, had standing to challenge that ongoing policy and practice. The Court need not address either one of those errors, however, for the association's claims to survive. And that's because at the time of the operative complaint being filed, the association had one member, the Brantley family, with an ongoing injury, in fact, tied to the challenge practices. Now, the Brantleys, even after the Army modified or purportedly modified its diabetes accommodations policies ---- Sotomayor, what do you mean, purportedly? We'll assume for purposes of the record that they modified the policy. They modified the policy. Before, they said you couldn't get the treatment, and afterwards, they said you could if you went through an administrative procedure. What is purportedly about that? So we'll accept for purposes of the record there is a modification. It's just modification that did not fix the ongoing discrimination. But even if we were to accept ---- That's a fair argument. Thank you, Your Honor. Arguing purportedly is not. Thank you, Your Honor. Go ahead. Even if we're to accept that the district court's erroneous finding on mootness, which excluded all evidence of harm to the membership, so we got eight members affected prior to that modification of the policy, even if you accept all of that, after the policies were modified, the Brantleys had their son, O.B., in Army child care programs. He had a pending request for diabetes-related accommodations. He needed insulin. After the purported policies ---- sorry. After the policy's modifications went into effect, O.B. did not get that accommodation. The Army failed to accommodate him in their child care programs. As a result, his mother had to leave work three times a day for a period of 90 minutes each to administer insulin. Now, she had the choice. She could either let him go to the program, risk the fact that he'd be in danger, or effectively provide child care herself, defeating the purpose of the program. Don't you have to prove a diversion of resources? Your Honor, I'm actually talking about the association standing right now based on its members. That's what I'm talking about. You don't ---- you could have either membership or associational standing or a standing based on diversion of resources. We would argue we have both here, but I'm addressing ---- you don't even need to address the diversion of resources to find the association's claims survive. Well, just humor me. What was the diversion of resources under the modified policy? Okay. So even if we accept the Court's error and mootness and we're looking at a modified policy ---- Give me a long-winded answer to a short question. Okay. What was the diversion of resources? Your Honor, even if we're talking about one ---- What was the diversion of resources? We're talking about one attorney intake phone call and the follow-up work on that attorney intake phone call. That's it. If you look at the record that year, the same year the policies were modified, the association had 405 intake families it couldn't serve. So if it went from 405 intake families it couldn't serve to 404 families, that's a concrete and quantifiable ---- that's a perceptible impairment of their resources. That's a diversion of resources. It meets the standards set by the Supreme Court in Scrapp. Scrapp looked at a litany of minimal harms to organizations for purposes of diversion of resources, whether it was a $1.50 poll tax, a $5 fine, a fraction of a vote. Here you've got one family they couldn't assist. And there's a quantifiable list of 405 they couldn't serve that year. You've got to focus on the new policy, though, right? Well, that's after the new policy went into effect, Your Honor. That attorney intake that they took on meant that they couldn't serve another family. So as to the new policy, it's that one intake call. Correct, Your Honor. Now, the Court, for purposes of this case, need not parse that finally, because the mootness finding has no support in law. Effectively, what the district court did was analyze the or failed to analyze the fact that the operative complaint is the first amended complaint. Now, the policies and practices that existed at that time, at the time the first amended complaint was filed, are the same that are in existence today. This is not a mid-litigation change where the policies were modified after the complaint was filed, so you wouldn't really have a mootness analysis. What the court did was look at those policies and practices and make it a merits determination, saying, well, even if they're alleging these policies and practices discriminate on the basis of disability, they don't because they're not the same as the policies and practices that existed before. There were individuals that the association represented or argued on behalf of that didn't get diabetes-related treatment under the old policy, correct? Correct. And they're identified in the complaint? Well, they're identified in the affidavits, and that's all you need under the Supreme Court's ruling. I take that as part of the complaint. Are any of those individuals under the modified policy receiving insulin treatment? Your Honor, even after the, so that you've got the three months after the complaints filed, there's a motion to dismiss, at the time the record ends, you still have families waiting to receive insulin accommodations, whatever you want to call it, on the new or modified policies, they're still waiting. You've got, you've got the shackle. Waiting or refused? They're waiting, but if you look at the multi-layer, multi-month long review process, that that, you know, essentially a family like the Brantleys or like the Shacklefords or like the Gohms that are all referenced in these affidavits, they, they can't afford to wait three months or four months for the Army. Under the Army's policies, the new policies, the approval process goes all the way up to the Surgeon General. It's a seven or eight-step process. Even if you look at the way the, the Army described it in its briefing, it takes, you know, three to four months. An Army family can't sit around and wait three to four months for, for a determination on discrimination on, on their accommodation. As pled in the operative complaint, under Section 504, if the covered entity's methods of administration of its program have the effect of discriminating on the basis of disability, and that, that includes a failure to accommodate, it also includes defeating the purpose of the program because of, of the process. Here — But why isn't that a new controversy? Because now, now there was a blanket prohibition on care. That's been decisively rescinded. And so now you're saying, well, I don't like the new process either because the delay is too substantial and it's burdensome. It sounds like a different case to me. It is a different case, Your Honor. And that, that's why there was a — But then that's where, that's where the mootness comes in, right? Well, no, but there was an amended complaint. The operative complaint here, if you, if you look at what, at, you know, civil procedure, the operative complaint is the amended complaint. All, all that happens before is thrown out the window. At the time the amended complaint was filed, Your Honor, there was, there was this multi-layer, you know, multi-office review process that discriminated on the basis of disability. That's your complaint. That's our complaint. That's the existing complaint right now. That sort of goes into what I was asking. What, what sort of relief do you ask over here? Well, Your Honor, as the affidavits show, and actually as the amended complaint alleges, other entities can, can make a decision on the administration of insulin, which is the core accommodation at issue here, within ten business days or two weeks. Now, when the Brantleys, when they pulled their kid out of Army child care programs, they called seven different providers. All of them said they could accommodate him immediately. They ended up getting him in a program where he was accommodated in two weeks. We, we filed a 28-J letter with the Court. The Justice Department, which is on the other side in this case, entered into an agreement with kinder care nationally, and under that agreement, kinder care has to respond to all diabetes accommodations, including the administration of insulin, within ten business days. So that, what we're, what we're seeking is a, a more streamlined process that doesn't require Army families to miss work for three weeks or, or three months. So you're asking for injunctive relief? We're asking for injunctive and declaratory relief. We've got valid allegations that these, these methods of administration have the effect of discriminating against Army families and their children. Now, if, as the Army did in its briefing, if it says that there's a safety justification or, you know, the military is different, I fully understand the military is not the same as kinder care, that's an argument on the merits for summary judgment or trial. There is no evidence on the record we have that any of those justifications exist.  All right. Anything further, or would you like to save the rest of your time? I'll, I'll save the rest of time for rebuttal, Your Honor. Thank you. May it please the Court, Edward Himmelfarber, the Department of Justice. The Army's old policy was revoked decisively in June 2017, and it's not even visible in the rearview mirror anymore. We should be talking solely about the new policy. If they have injuries under the new policy, they have standing. If they don't have injuries under the new policy, they don't have standing. And so what I think we should focus on here is, I mean, to start with, I should say, to start with, the Army is, we were just talking here, the Army is a huge organization. It's got multiples, many multiples of different installations, something like 60 or 70 different installations. Some of them are in Europe, I understand, some in Japan. They, it's a big process for them to switch, as, as Sam said, it's not, it's not like kinder care. The Army has to go through a lot of process to do this, and that's what they started to do in June 2017. And we don't have the, what we have in the, let me tell you what we have in the record. In the motion to dismiss, filed on, I believe August 4th, 2017, there's a group in Garfield who talked about what they had already done as of August, the beginning of August 2017. They had conducted nine teleconference training sessions with 72 installations about the new policy. They had trained more than 200 CYSS staff and Army public health nurses about the new policy. They spent hundreds of man hours doing this. There had been one requested accommodation that had been granted. There were two more they were expecting to come in. And unfortunately, we don't have the full record because the association insisted on first suing immediate, amending his complaint immediately, and then when the case was dismissed, saying that it was not going to amend the complaint again, and just asked to have the case dismissed and rejected. How long does it take under the new policy to get approval? The outside limit under the policy is approximately four months, which is, I think, something that... What is a dependent, a service member dependent in need of insulin injections do in the interim? Well, there are different ways of doing it, and they're not all that exciting, frankly. And over a period of time, that's going to change, too, because if you have a large enough institution, you may well... The question is, what do they do during those four months? One possibility is they have to administer it themselves. Another possibility is they can have somebody come in, a nurse, come in and handle it. If the installation has a contract nurse already there, they can get a temporary accommodation while the full accommodation... But they wouldn't be refused insulin. Refused? No, if they administered it themselves... No. I'm sorry. Service member dependent comes in and their blood sugar is 30. They need insulin. Yes. What happens? You mean if they don't have the accommodation already? Yeah. Under the new policy, what happens? If they don't have the accommodation, I assume that has to be treated as some kind of emergency. But normally, somebody who has type 1 diabetes, the parent of a child with type 1 diabetes would ask for the accommodation. And wait four months? Yeah, have to do something temporarily. But as I said... What would that consist of? Well, sometimes it involves being there personally to administer it the way that you would administer it if the child were at home. So the dispute is not about the availability of insulin itself. It's the injection? Well, there are two things that require this longer process for accommodation. One is determining the proper dosage, which is very important. Your opponent says there are service member dependents who are in need of insulin who are not getting it, even under the new policy. Is he correct? What he's saying, Your Honor, I don't think that's correct. But if I can... I'm trying to understand what he's saying. I believe what he's saying is that they're not getting an accommodation that is what the family wants. The family would have to... The mother or father would have to not be at work at a particular time to administer it. Nobody's refusing... Right. Well, he's saying the new process is too burdensome. That's correct. Because the process isn't streamlined enough. That's correct. There could be a substantial delay of months. And so, essentially, it would necessitate a parent or family member leaving work multiple times a day in order to administer it. That's their merits argument. Yes, Your Honor. We're not here on the merits. We're here on standing and mootness. But yes, that's their merits argument that the delay is discriminatory. It's no question that's their argument. And the problem is, as I said, the Army has a large number of installations. Some of them are large and some of them are small. Some of them have never had a request for insulin accommodations. They have to hire out for contract nurses. They have to do background checks on all the nurses. It's a big process. And that's part of the problem here. And as I said, it may become easier over time because a larger institution may well have already have a type 1 diabetes child there. And there may already be a contract nurse there so that maybe they can do a temporary accommodation. But there are installations in the Army that are just small and don't have this before. And if somebody comes to one of those installations and says, my child needs this go, they have to go through the process. The service member brings a child into the emergency room of a base hospital in insulin shock. What happens? I assume that it's handled as an emergency, but we're talking, I think, provided insulin and the medical personnel at the facility administer it. That's correct. But that's not what we're talking about here, Your Honor, that I assume that that's what would happen if there is a if there is a non-basic hospital. But yeah, what we're talking about here is parents want their kids to be in daycare or some other youth program in the Army. And they want somebody to be there to administer the insulin for for the child on a regular basis to determine the proper dosage and to administer the insulin. That's what the dispute's about. Yes, because there is a wide range of new policies, a wide range of insulin of I'm sorry, of diabetes related accommodations that can be done by trained staff. So what is it about the process that requires four months? The problem is it has to go to a certain level because that official, the assistant chief of staff for institution management, may need to transfer people to that installation in order to provide the care that's necessary to to have a child like that at the program. And that's the part that's the hard part. As I said, there are many accommodations for diabetes, type one diabetes that can be done by trained staff there. And those can be done and they have to be accepted at the at the coordinator level. They have to be accepted right away and the child can go and can have those accommodations. It's the harder ones like the determining the dosage and the actual injecting of insulin that that requires this process is the agreements that apparently the army has, the department the army has entered into with kinder care, among other providers. Does that flow into this? I'm not sure about the kinder care you're on there or whoever, private providers of some kind. And I'm sorry, the question is, as part of the new policy, is this effort described by your opponent to have outside providers provide the insulin and insulin objection injections? Is that part of the process? Yes, it is. That's going on now. Yes. And there's a lot of information that's not in the record that I could tell you, but I'm not going to. Sure. Sure. But, you know, we have had this policy in effect for over two years now, and it would make much more sense if if we were arguing about how it's been implemented over two years instead of over six weeks. Do you agree with your opponent that the plaintiff does not have standing here, or you disagree with him, I should say? Does not have standing? He says he doesn't have standing. Do you think they have standing? No. No, they don't. The individuals are we talking about? Are we talking about the organization? Organization. The organization itself? No. I mean, here's what happens to the organization. The organization says, based on its own declarations, it has two lawyers working on this. If you do the math and the figures they give you and make some assumptions, they're turning away approximately a third of their phone calls for legal help. And what they're relying on is one phone call. There's no evidence in the declaration that this one phone call required them to expend any extra money. All that they're saying is that somebody else was unable to get legal assistance from them. But at the same time, you have approximately 2,000 calls, almost 2,000 calls a year, and they're turning away a third of those. You can't exactly pin the blame on that one phone call that they took. And their whole position is that that one phone call is responsible for their injury. But there's no evidence in the record that that prevented them from taking another phone call. They're just saying that, as a general principle, when they have all these requests coming in, they're unable to take a large number of phone calls. As for the individuals, only two of them actually are identified as members of the organization, and that's something that we're kind of fudging around here. Several of the people putting in declarations are not identified as actual members of the association. The two members are Ms. Brantley and Ms. Bendlin. And all of the injuries, including the ones who are not identified as members, all of the injuries were under the old policy. And, you know, some errors were made along the way. Kagan. Unless there's an indication that they were deterred from seeking accommodation under the ---- That's right. The two of them claim that they were deterred, but that's not really a relevant thing. All it would have taken was a phone call to somebody who's knowledgeable at the Army about the new policy and could have walked them through the process, and they could have told them how to go about getting an accommodation. But they didn't even try to do that. And I think that if it's all based on your concern about how they were treated under the old policy, the old policy doesn't exist anymore, and it didn't exist when they allegedly suffered their injury. Part of it did exist when they had their injury, and then it was changed, and they did not attempt to get an accommodation under the new policy. So I think that that part, there's no representational or associational standing. And as I said before about the lack of expenditure of funds, there's no direct standing for the organization either. And the old policy was long ago revoked, so that part is moved also. And that's our position, and we think the district court's decision was well-reasoned and should be affirmed. Your Honor, to address diversion of resources based on the government's position, all that's in the district court's ruling in scrap Havens Realty, even this court's recent decision in our 28-J letter in East Bay Sanctuary Covenant, is that the organization spend resources on this issue it would otherwise spend in other ways. And under the scrap decision, we are talking just about an identifiable trifle. And what the court recently did in clarifying in East Bay Sanctuary Covenant is that can be something that happened in the past based on the challenge conduct. It could also be ongoing, imminent future harm based on the challenge conduct. Here you have that identifiable trifle in the past after the new policies or modified policies went into effect. You have that one phone call where they had 405 people they couldn't serve. If that would have gone down to 404, that would be that identifiable trifle. There's also testimony in the record about constituents that called and got assistance all the way through August. So it's indicative that there is an ongoing future problem. One of the reasons there is this future problem is because this bureaucratic four-month-long period is very hard for Army families to navigate. There's no question, and all the way to the very end of the record, the association is still helping people with this issue. There's no question it's going to go on into the future. So that's the perceptible impairment. How much time do you think they ought to have to work this out instead of the four months down to what? There are plenty of organizations that do it within two weeks, and that's what we would be pushing for in our complaint. I wanted to address the piece about the merits. The reason we're talking about the merits is because the district court confused the merits inquiry with its jurisdictional inquiry. So it turned the motion to dismiss effectively into a motion for summary judgment, and its position, just like the Army's position, is that the, you know, the new policy somehow wiped out all the discrimination and, therefore, there's a mootness issue. Well, if you look at what was in existence at the time the operative complaint was filed, there's ongoing discrimination. It wasn't fixed. The methods the Army was using to administer its program with respect to kids with diabetes still required this — these massive bureaucratic hurdles for these families. That's an ongoing injury. So there really shouldn't be a mootness inquiry, but that's to address why we're getting into the merits. It's because the district court did. What we would suggest the court do is remand this, and we could address all their defenses, whatever work they've done, whatever rationale they have for why it should take four months to get that accommodation, put it for summary judgment. We're not there yet. I also wanted to address the emergency situation and what, you know, what the Army had raised in response to the question about what happens when a child needs insulin. Under the existing policies — there's nothing about emergency situations on the record — families like the Brantleys have no other choice. If the kid needs insulin, they've got to leave work and go down to the program and do it while their accommodation request is pending. The Brantleys' accommodation request was pending for eight months prior — prior to the implementation of the new policy. It was — it was pending for another three weeks after the new policies went into effect. They actually had somebody on staff say that they would administer insulin for them. That person went up the chain at the Army and was told, no, they've got to go through the process. So that — that — that's an ongoing injury. Army families cannot afford to wait three to four months like — like the Brantleys were forced to do. Thank you, Your Honor. All right. Thank you very much, counsel, for your argument, both sides. The matter is submitted.
judges: Siler, Hawkins, Nguyen